The Chief Justice
delivered the Opinion of the Court.
John J. Marshall having, as surety of Richard Taylor, deceased, advanced to the Bank of Kentucky, in property at a. conventional price, the amount of two judgments it had obtained against Taylor and himself, and procured from the Bank a written transfer of the benefit of the judgments, afterwards assigned his equitable subrogation to Thomas S. Page, for a valuable consideration.
Richard Taylor died, in 1830 insolvent, without having paid any portion of the said judgments. Moses R. Morrison, his son-in-law, who was appointed his administrator, sold his household furniture to James Taylor, and took his promissory note for the price, payable to himself as administrator; and which, about five years after its date, and shortly after James Taylor’s death, he assigned to Swigert, Moffit & Co., for groceries furnished find to be furnished to himself, for sale in his own right.
The assignees having obtained a judgment on the said note against the said Page and one Lockwood, as the administrators of the obligor, Page filed a bill in chancery, to enjoin it, and have the amount, of it applied as a cred, it, on the said judgments against Richard Taylor — alleging that the assignees had bought the note for the inequitable purpose, of enabling Morrison to convert the price to his own use, and defraud the creditors of his intestate.
All proper parties having been made, the assignees and Morrison answered the bill, and denied the alleged collusion; and Morrison also averred that, though the note was made payable to him in his fiducial character, yet, nevertheless, he owned most of the property for which it was given, and therefore, the greater portion of the amount of it actually belonged to him in. his individual right,.
A note being pay able to an adm’r. as such, and thus appearing upon its face, to be assets,—the mere fact that the adm’r had held it for 5 years, did not authorize assigness to whom he transferred it, and who knew that he was in laboring circumtances, and the estate he represented insolvent to presume that he had become a creditors of the estate, so that he had a right to apply the note to his own use.
A note which an adm'r. has received for goods of the intestate, is assets in his hands; and tho' (as ruled in this state,) an adm’r. de bonis non wo'd not be entitled to it-it is nevertheless, a trust fund which the adm’r. is bound to apply to the payment of the intestate's debts, & the conversion of which to his own, is undoubtedly a devastavit.
A purchaser who buys property of atrustee, knowing it to be trust property, takes it subject to the trust, And-
The Circuit Court decreed the relief sought in the bill, and perpetually enjoined the judgment against the administrators of James Taylor.
Is that decree right? We think it is.
There is no positive proof that the assignees knew that Marshall or Page was an unsatisfied creditor of Richard Taylor. Rut it may be presumed that they were acquainted with the insolvent condition in which Richard Taylor died, and with the embarrassed and laboring circumstances of Morrison. And the note itself, when assigned to. them, showed on its face, that it had been given to Morrison as a fiduciary, in trust for the creditors of his J. intestate.
The record contains no fact tending to the deduction that Morrison had a personal right to the amount of the note, on account of his alleged interest in the consideration, or that he was a creditor of his intestate, or had advanced his own money in payment of any of his debts, so as to authorize the appropriation of the note to his own use; unless the time which had elapsed since the note became due, could be considered as authorizing some such presumption: and- this circumstance alone, was, in our judgment, insufficient in this case, to have justified any such inference by the assignees.
Although (according to the settled doctrine in this state, recently ruled otherwise in England, 1 Barn, and Cress. 150,) an administrator de bonis non of Richard Taylor would not have been entitled to this note, it was, to the extent of its value, indisputably a trust fund in the hands of Morrison, which it was his duty to apply to the payment of his intestate’s creditors; and for converting which to his own use, he was undoubtedly guilty of a devastavit, in judgement of law. And he had he no more right to apply the amount of it to his own use, than he would have had to make the like conversion of the furniture for which it had been given. It was, in every beneficial sense, assets to the amount of which his intestate’s creditors had a clear right in equity.
It is a well established principle of equity, that he who buys from a trustee property known by the purchaser to *430 be held by the vendor in trust merely, takes it by implication and intendment of law, subject to the trust.
Tho’ an ex’or or adm’r has a right to sell or dispose of the assets, for the benefit of creditors &c. and the purchaser is not bound to see to the application of the proceeds-yet, if it is done with a fraudulent or unauthorized intention of converting them to the individual use of the seller, the purchaser—if he is apprised of the intention at the time of the purchase, will be considered, in a court of equity, as acting in bad faith and, as holding the property purchased by him or its value, subject to the trust. And—
The consequences are the same where an ex’or or adm’r uses a part of the trust fund to pay his own debts, or to buy property for his own use, and the party with whom he deals, knows that the funds are thus misapplied.
And in such cases, creditors of the dec’d whose assets have been thus misapplied, may proceed, by bill in chancery, in rem. or otherwise, to subject the property in the hands of the party who has received it, or its value, to the, payment of their debts.
And it is now, also, well settled by courts of equity that, though an executor or administrator has a right to sell and otherwise dispose of assets for the benefit of creditors and other beneficiaries, and that a bona fide purchaser of such property from any such fiduciary, is not bound to see to the application of the proceeds. Yet if, at the time of purchase, he be apprised of the fact, that the sale is made-for the fraudulent or unauthorized purpose of converting the fund to the individual use of the trustee, he should be deemed guilty of bad faith, and will be considered as holding the property so bought, or the valpe of it, subject to the trust under which it was held by his vendor.
It seems, also; to be now well settled that if an administrator or executor apply any portion of the trust fund to the payment of his own individual debt, or to the purchase of property for his own individual use, prima facie he should be deemed guilty of a breach of trust, and the person with whom he thus dealt, knowing the fact of misapplication, should also be considered prima facie guilty of participating in a constructive fraud.
These equitable principles have been illustrated and established in the following leading cases. Hill vs Simpson, 7 Visey, 153; McLeod vs Drummond, 14 Ib. 352, and 17 Ib. 152; Scott vs Tyler, 2 Bro. c. c. 431-2, Dick. 712; Field vs Scheiflin, 7 Johnson’s Chy. Rep. 150; Dodson vs Simpson, 2 Rand. Va. Rep. 294; Graff vs Castleman, 5 Ib. 195; Keane vs Roberts, 4 Mad. Chy. Rep. 322.
In Scott vs Dickins, (supra,) in which-an executrix had disposed of bonds of hex testator, in satisfaction of her own debts, four years after his death, Lord Thurlow was of the opinion that the creditors of her testator had an equitable right to a decree against her creditors who had thus received those" bonds; and among .other things, said — “if one conceits with an executor by obtaining the “testator’s effect's at a nominal value, or at a fraudulent-“undervalue, or by applying the real value in the pur-"chase of other subjects for his own behoof, or in extin- *431 “ guishing the private debt of the executor, or in any oth- " er manner contrary to the duty of the office of executor, " such concert will involve the seeming purchaser, or his "pawnee, and make him liable for the value.”
In Hill vs Simpson, (supra,) Sir William Grant said —" It may be essential that the executor should have the "power to sell the assets ; but it is not essential that he ‘‘ should have the power to pay his own creditor, and it, " is not just that one man’s property should be applied " to the payment of another man’s debt;” and therefore, he also said — " though it may be dangerous at all to re- “ strain the power of purchasing from an executor, what ‘‘ inconvenience can there be in holding that the assets, “known to be such, should not be applied in any ease for. " the executor’s debt, unless the creditor should he first " satisfied of his right”
In Andrews vs Wrigley, 4 Bro. C. C. 137, Lord Anvanly said — " Can there be a stronger case of a. devastavit than "an executor aliening the property of his testator to pay “ his own debts?”
And, in Keane vs Roberts, (supra) the Vice Chancellor, after reviewing all the previous cases on the subject, illustrated the principle dedueible from them all, in the following manner-" every person who acquires personal " assets by a breach of trust, or a, devastavit in the execu"tor, is responsible to those who are entitled under the "will, if he is a party to the breach of trust. Generally " speaking, he does not become a party to the breach of “ trust by buying, or receiving as a pledge for money ad“vanced to the executor at the time, any part of the personal assets, whether specifically given by the will or "otherwise; because this sale or pledge is held to- be " prima facie consistent with the duty of an executor. "Generally speaking, he does become' a party to the "breach of trust, by buying or receiving in pledge any " part of the personal assets, not for money advanced at " the time, but in satisfation of his private debt; because "this sale or pledge is prima facie inconsistent with the " duty of an executor."
This is the true dextrine, as founded on principle and established by adjudged cases.
Where a note which an adm’r passed off in the purchase of goods on his own account, was payable to him, as adm’r, and thus appeared upon its face, to Be trust property; & there was nothing to show that the adm’r had, as a creditor of his intestate’s estate or otherwise, any right to apply it to his own use— held that the assignees must be considered as having acquired the note mala fide, or at least, as holding it in trust for the creditors of the intestate.— And that a judgt. on it having been recovered ag’nst the adm’rs, the obligor, 1 of whom was an assignee (in his own right) of judgts. against the obligee's intestate (for the sale of whose estate the note was received, ) he may sustain an injunction against the collection of the judgt. on the note against him and his co-adm’r—& have it set off against an equal amount of the judgts. which he holds as assignee A credit or having a judg’t. against principal fit surety, may, upon receiving an advance from the surety, transfer the benefit of the judgment to him; and will thereby be subrogated, in equity, to all the rights of the creditor, and may enforce the judgt. for his own benefit; and the statute of limitations will not apply to the judgt. as it would to the implied assumpsit that would accrue to him upon his paying off the judgt.
*432 Ail executor or administrator has no right to apply assets to his own use. As, however, he has a general authority to sell, a purchaser who should not generally be required to know when a sale is necessary, nor whether the proceeds will be faithfully applied, should prima facie not be responsible, either for an unnecessary sale, or for a misapplication of the price; and should not be effected by the improper or fraudulent conduct of the vendor, unless he had some knowledge of the actual or contemplated breach of trust at the time, of his purchase, and was guilty of express or implied collusion. When, therefore, he advances money to an executor or administrator, on either a sale or a pledge of assets, as he has a right to presume that the purpose is the payment of debts or legacies to which the assets should be applied, he is prima facie irresponsible for the fraudulent or improper misappropriatioii of the money by the fiduciary. But when assets are applied to the individual use of the executor, with the knowledge of the party receiving them, such party should prima facie be deemed guilty of collusioii, and should, not be entitled to the property thus received, because, when he took it, he had presumptive notice that it was illegally converted; He therefore, either acquired ho title to the property, because he knew that the vendor had no right to sell it for his private use; or, knowing that fact, he is placed by the,law in the vendor’s shoes, and holds the assets as he did — subject to the claims of the creditors of the testator or intestate. And any of those creditors have an unquestionable right to enforce the implied trust, in rem or otherwise.
In this case, it has not been intimated that Swigert & Co. believed, or had any cause to believe, that the note which they bought from Morrison with groceries for his own use, was, in any sense, his property, or that the proceeds would be applied faithfully as assets.
And therefore, as they were notified by the style of the note, that it was a portion of the trust fund which it was Morrison’s duty to apply to the payment of his intestate’s debts, they must be presumed, in the absence of any fact to the contrary to have acquired it male fide, in judgment of law, or at least on an implied trust for Rich *433 ard Taylor’s creditors. And this deduction of law, which justice and policy require, even though there may have been perfect good faith in fact, is rather fortified by the circumstance that they took from Morrison bond and security for indemnifying themselves in the event of their not being able to make the amount of the note out of James Taylor’s representatives; for though an apprehension that James Taylor did not owe the amount of the note, might have been, as they allege, one motive for that precaution — still there is an intrinsic probability that some doubt as to Morrison’s right to convert the note to his own use, had its full share of influence. All the circumstances, unexplained, indicate that there was strong ground for this doubt. And it was their duty, therefore, to ascertain that he had authority to make the conversion, before they bought the note for a consideration obviously intended for his personal use and profit alone. If he can indemnify them, they will lose nothing. If there be danger of loss they should not throw the hazard on Page, by being permitted to enforce their judgment; for they trusted most, and risked most,' and moreover, have other security ; which he has not. This contest is, in fact, virtually between Morrison and Page.
On receiving from J. J. Marshall, as Richard Taylor’s surety, the amount of its judgments, the Bank had a right to substitute him, as the judgment creditor in equity — the subrogation being, as it doubtless was, one of the considerations for the advance as made. Marshall having become thus equitably entitled, by express contract, to the benefit of the judgments, had a right to enforce them against Taylor. And therefore, as he did not choose to discharge the judgments, so as to place his chance for reimbursement on an implied assumpsit by Taylor, to pay to him the amount which he had advanced, the statute of limitations cannot apply.
Nor is it, in this case, material whether Marshall advanced the full amount of the judgments; for it is evident that the Bank received from him much more than the amount of the note sold by Morrison to the appellants.
Then it seems to us, that Page has an equitable right to enjoin the judgment against himself and Lockwood, by *434 applying the amount of it as a credit on the- judgments assigned to him by Marshall. It is not necessary to show that the amount of the judgment is tabula in naufragio: without proving a state of case, in which one party or the other must lose, the facts entitle him to priority in equity.
Wherefore, the decree of the Circuit Court is affirmed.